UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE No. 11-20069-CIV-JORDAN

MARIBEL PEGUERO,                      )
          Plaintiff            )
                          )
vs.                                   )
                          )
DAVID DELAURENTOS, et al.,            )
                          )
          Defendants           )
_____   )

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

For the reasons below, Maribel Peguero's motion for summary judgment [D.E. 28] is DENIED; Officer David Delaurentos' motion for summary judgment [D.E. 105] is DENIED; Officer Delaurentos' and Miami-Dade County's motion for partial summary judgment and motion in limine [D.E. 106] is GRANTED IN PART and DENIED IN PART; and the County's motion for summary judgment [D.E. 107] is GRANTED IN PART and DENIED IN PART.

## I. FACTUAL BACKGROUND

The case concerns the alleged liability of Officer Delaurentos and his employer, Miami-Dade County, arising out of the Officer's shooting and killing of Ms. Peguero's son, Jose Gabriel Ventura, after Mr. Ventura attempted to flee from a traffic stop. Ms. Peguero has filed this suit as the representative of Mr. Ventura's estate.

On the morning of February 11, 2007, at approximately 3:00 a.m., Officer Delaurentos shot and killed Mr. Ventura in the Northside District of Miami, the area of Miami-Dade County bounded by Northwest 7th and Northwest 17th Avenues and Northwest 20th and Northwest 135th Streets. That evening, Officer Delaurentos was working the 9:00 p.m. to 5:00 a.m. shift and was riding alone in his vehicle. Officer Delaurentos had been called into the area to provide translation services for another officer. While helping to translate, Officer Delaurentos observed a vehicle drag racing and revving its engine. This was the vehicle Mr. Ventura was driving. Officer Delaurentos left his translation post and followed Mr. Ventura's car west on Northwest 95th Street to perform a traffic stop. These basic facts are undisputed, but the exact sequence of events leading up to the subsequent shooting is not.

## A. THE STOP

Officer Delaurentos effected a traffic stop that resulted in Mr. Ventura stopping his car on Northwest 27th Avenue and Northwest 110th Street in a dedicated left turn lane on the northbound side of the road.  Officer Delaurentos exited his vehicle on the driver's side and approached the driver's side of Mr. Ventura's car.  As Officer Delaurentos neared the car, Mr. Ventura drove away from him, into the intersection.  At this point, Officer Delaurentos already knew the make, model, and tag number of the vehicle Mr. Ventura  was driving.  He also knew that there was a passenger in Mr. Ventura's car.

## B. THE SHOOTING

As Mr. Ventura drove away, Officer Delaurentos moved westward, stepping onto the median between the northbound and southbound lanes and then into the southbound lane in order to get a better view of the driver or the vehicle.  As this was happening, Mr. Ventura made a u-turn, and then headed south in the eastern-most lane of Northwest 27th Avenue, back towards where Officer Delaurentos was standing.  As Mr. Ventura made the u-turn and was still some distance away, Officer Delaurentos got a visual on the driver of the car (i.e., Mr. Ventura).

After the u-turn, the vehicle traveled directly toward Officer Delaurentos' location at approximately 30-40 miles per hour. Officer Delaurentos testified that, as the vehicle approached him, he believed his life was in danger; he therefore jumped away from the vehicle and shot into the vehicle at Mr. Ventura, killing him.

As discussed later, it is disputed whether Officer Delaurentos stayed on the median and/or stepped into the road before, after, or simultaneously with Mr. Ventura completing the u-turn and heading south.  Ms. Peguero contends that Officer Delaurentos himself stepped into the lane of traffic in which Mr. Ventura was already driving, thereby creating the threat of deadly force.[1]  The defendants assert that, as Mr. Ventura completed the u-turn, he directed his vehicle towards Officer Delaurentos, who was already standing in the road. After the shooting, the Miami-Dade Police Department's Professional Compliance Bureau reviewed the incident and exonerated Officer

---

[1]     The standard operating procedures governing Miami-Dade police officers like Officer Delaurentos indicate that a police officer should avoid putting himself in a position where deadly force is the only option.

Delaurentos. It determined that there were no violations of police policy during the encounter with Mr. Ventura.

### C. Mr. Ventura's Status and Blood-Alcohol Level

It turned out that Mr. Ventura was not lawfully in the United States and had no driver's license. He also had a blood-alcohol level above 0.08 grams per 100 milliliters at the time of his death.[2] Officer Delaurentos had no knowledge of either of these facts at the time of the shooting.

### D. Miami-Dade County's Screening and Hiring Procedures

During employment screening, the Miami-Dade Police Department assigns applicants to one of three classifications: acceptable, marginal, or unacceptable. The Department hires applicants who are classified as "acceptable" or "marginal," but not those classified as "unacceptable." The Department does not provide any more training to officers who are classified as "marginal" than it does to officers who are classified as "acceptable." Officer Delaurentos had been classified as "marginal" during his employment screening.

## II. Legal Standard

A motion for summary judgment should be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). *Accord Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Where the non-moving party fails to prove an essential element of its case for which it has the burden of proof at trial, summary judgment is warranted. *See Celotex Corp.*, 477 U.S. at 323. That is, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)). The court "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party." *See Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997). It must also "resolve all reasonable doubts about the facts in favor of the nonmovant." *See United of Omaha Life Ins. v. Sun Life Ins.*, 894 F.2d 1555, 1558 (11th Cir. 1990).

---

[2] Under Florida law, a person is intoxicated if he has a blood-alcohol level of 0.08 or more grams of alcohol per 100 milliliters of blood. *See* Fla. Stat. § 316.193.

### III. ANALYSIS

Ms. Peguero asserts four claims: (1) willful and wanton battery under Florida law against Officer Delaurentos individually; (2) battery, without willfulness and wantonness, against Miami-Dade County under Florida law; (3) negligent investigation and pursuit against Miami-Dade County under Florida law; and (4) a claim under 42 U.S.C. § 1983 against the County for violation of Mr. Ventura's Fourth Amendment rights.

Ms. Peguero moves for partial summary judgment on liability as to all claims. The County and Officer Delaurentos move for summary judgment as to all claims based on Fla. Stat. § 768.36(2), and as to all the state law claims, asserting that Mr. Ventura's siblings are not proper claimants under Florida's Wrongful Death Act, Fla. Stat. § 768.16, *et seq*. Officer Delaurentos moves for summary judgment as to Count I, arguing that his actions were not willful and wanton as a matter of law because the shooting was justified. Miami-Dade County moves for summary judgment on Count III, contending that sovereign immunity bars this claim, and on Count IV, asserting that Ms. Peguero cannot demonstrate municipal liability under § 1983 pursuant to *Monell* and its progeny. I will address each of the parties' arguments in turn.

### A. MS. PEGUERO'S MOTION FOR SUMMARY JUDGMENT ON LIABILITY

Ms. Peguero moves for partial summary judgment as to each defendant on the issue of liability. Ms. Peguero argues that the facts, viewed in the light most favorable to the defendants, reveal that (1) Officer Delaurentos violated the County's standard operating procedures by shooting Mr. Ventura; (2) when Mr. Ventura was shot, Officer Delaurentos had already successfully avoided the vehicle, and hence, was no longer in a situation where discharge of his weapon was necessary; (3) Officer Delaurentos was negligent in deciding to discharge his firearm; (4) Officer Delaurentos battered Mr. Ventura by improperly and intentionally discharging his firearm; and (5) the only defense available to the defendants on the issue of liability on Counts I, II, and III is whether there was a superseding or intervening cause that may have contributed to Mr. Ventura's death.

Contrary to Ms. Peguero's assertion, however, it is not clear that Officer Delaurentos violated the County's standard operating procedures or otherwise acted improperly when he shot Mr. Ventura. For example, the County has presented depositions (e.g., the deposition of Officer Delaurentos and Lieutenant Ivan Rodriguez) and the investigation of the Professional Compliance

Bureau indicating that no policies were violated by the shooting.  And, as noted earlier, it is disputed whether Officer Delaurentos put himself in danger and/or discharged his gun after he was safely out of the way of the car.  As a result, it would not be proper for me, on this record, to rule that Officer Delaurentos acted improperly in discharging his firearm.  Ms. Peguero's motion for summary judgment on liability is therefore denied.

### B.  FLA. STAT. § 768.36(2)

The County and Officer Delaurentos claim that they are entitled to summary judgment because Fla. Stat. § 768.36(2) bars Ms. Peguero's claims.

The statute provides as follows:

> (2)  In any civil action, a plaintiff may not recover any damages for loss or injury to his or her person or property if the trier of fact finds that, at the time the plaintiff was injured:
>> (a)  The plaintiff was under the influence of any alcoholic beverage or drug to the extent that the plaintiff's normal faculties were impaired or the plaintiff had a blood or breath alcohol level of 0.08 percent or higher; and
>>
>> (b)  As a result of the influence of such alcoholic beverage or drug the plaintiff was more than 50 percent at fault for his or her own harm.

The defendants suggest that because Mr. Ventura had a blood alcohol level over 0.08 percent they are entitled to judgment as a matter of law.  This argument, however, ignores the second element of the affirmative defense:  that the intoxicated party must also have been found to have been over 50% liable for his own harm.  At this stage, given the disputed facts concerning critical events, the defendants cannot point to and have not pointed to any facts that definitively show that Mr. Ventura was over 50% at fault. Such a determination of comparative fault is, moreover, for the jury. *See Pearce v. Deschesne*, 932 So.2d 640, 641 (Fla. 4th DCA 2006) (concluding that it was inappropriate for the trial court on summary judgment to make a determination as to the percentage of the plaintiff's fault). As such, summary judgment on this is ground is inappropriate.[3]

---

[3]     I note that, § 768.36(2), even if applicable, is not a bar to Ms. Peguero's § 1983 claim against the County.

### C. MR. VENTURA'S ILLEGAL IMMIGRANT STATUS

The defendants also move for summary judgment on the issue of damages for lost services and support or other impacts of death because Mr. Ventura was not a legal U.S. resident or citizen. I do not find the argument persuasive.

The complaint alleges that Mr. Ventura's siblings are dependents within the meaning of Florida's Wrongful Death Act, but it is undisputed that Mr. Ventura had no legal status in this country and therefore was not entitled to work here. The defendants point to *Veliz v. Rental Services Corp. USA, Inc.*, 313 F.Supp.2d 1317, 1336 (M.D. Fla. 2003), which holds that illegal immigrants may not recover damages for lost wages. *Veliz,* a products liability case, relied on the Supreme Court's decision in *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137 (2002), which concluded that the NLRB could not award back pay to an undocumented immigrant who had been terminated in violation of the National Labor Relations Act. *Veliz*, in refusing to award lost wages to a plaintiff who was an illegal immigrant, reasoned that such an award would "condon[e] prior violations of immigration laws, . . . [and be] tantamount to violating the [Immigration Reform and Control Act]."

Although the County correctly characterizes the *Veliz* decision, most Florida courts that have considered the issue have held that the immigration status of a decedent does not bar recovery under Florida's Wrongful Death Act. For example, in *Enterprise Leasing Company v. Sosa*, 907 So.2d 1239, 1241 (Fla. 3d DCA 2005), the Third District held that "[u]nder the Wrongful Death Act, there is no limitation on, or exclusion of, a decedent, his estate, or survivors based on the legal status of the decedent or the beneficiaries." It reasoned that the Florida Wrongful Death Act lists those who may recover for wrongful death in Florida, as well as what they may recover. Because the Florida Wrongful Death Act places no limitation on, or exclusion of, a decedent or survivor or dependent, based on his legal status, "[t]o engraft an exception for illegal immigrants would be to encroach on the legislature's turf." *Id.* And in *Villasenor v. Martinez*, 991 So.2d 433, 437 (Fla. 5th DCA 2008), the Fifth District ruled that the illegal immigrant status of the decedent was not an absolute bar to recovery in a personal injury suit, though it was relevant to present to the jury for determining damages because it would have affected the decedent's ability to work. Finally, a number of federal courts that have considered the issue in other contexts have concluded that immigration status is not

6

a bar to recovery.  *See, e.g., Gladames v. N & D Investment Corp.,* 2008 WL 4372889, \*2 (S.D. Fla. 2008) (rejecting the defendants' argument that the Supreme Court's decision in *Hoffman Plastic* barred recovery of unpaid wages under the FLSA, and stating that the argument was "both plainly wrong and controverts clear, binding precedent"); *Kalyta v. Versa Products, Inc.*, 2011 WL 996168, \*3-7 (D. N.J. 2011) (providing an overview of the law around the country on whether the immigration status of a claimant bars recovery in tort cases and holding that recovery of damages for undocumented workers in the personal injury tort context was not prohibited).  Because Florida courts recognize that the immigration status of a claimant or a decedent does not bar recovery under Florida's Wrongful Death Act, the defendants are not entitled to judgment as a matter of law.

### D.  LOST SUPPORT FOR MR. VENTURA'S SIBLINGS

The defendants  move for summary judgment on the theory that Mr. Ventura's siblings are not proper claimants under the Florida Wrongful Death Act, Fla. Stat. § 768.16 *et seq*.  The Act defines survivors as "any blood relatives" who are "partly or wholly dependent on the decedent for support or services."  Fla. Stat. § 768.18.  The defendants assert that there is no evidence that Mr. Ventura supported his siblings, and point to the depositions of each of the siblings.  Ms. Peguero appears to agree with the County as to Mr. Ventura's brothers, as she does not offer any argument or evidence to rebut the County's assertion. Nor is there any evidence in the record, other than the pleadings, indicating that Mr. Ventura supported or provided services to his brothers.

There is, however, evidence that Mr. Ventura supported his younger sister. Although, as the County points out, Mr. Ventura's 13-year old sister was not aware of how much money her brother contributed to the household, Ms. Peguero's deposition indicates that Mr. Ventura provided support to her [D.E. 106-1, at 10-12]. She could therefore be a "survivor" under the Florida Wrongful Death Act.  *See Duval v. Hunt*, 15 So. 876, 880-881 (Fla. 1894).  Accordingly, summary judgment as to lost support damages is granted in favor of the defendants as to Mr. Ventura's bothers, but denied as to Mr. Ventura's sister.

### E.  THE BATTERY CLAIM AGAINST OFFICER DELAURENTOS

Officer Delaurentos moves for summary judgment on Count I of the complaint on two grounds.  Neither is persuasive.

First, he argues that the Third District's decision in *Delaurentos v. Peguero*, 487 So.3d 879 (Fla. 3d DCA 2010), precludes this claim under the law of the case doctrine.  For the reasons stated in the order on the motion to dismiss [D.E. 74], the law of the case doctrine does not apply here.

Second, Officer Delaurentos asserts that the evidence shows his shooting of Mr. Ventura was justified.  Because there remain issues of material fact as to how the shooting took place (e.g., whether Officer Delaurentos was in danger), summary judgment is inappropriate.

Under Florida law, a "battery consists of the infliction of a harmful or offensive contact upon another with the intent to cause such contact or the apprehension that such contact is imminent." *Paul v. Holbrook*, 696 So.2d 1311, 1312 (Fla. 5th DCA 1999)(citing cases and other authorities). And pursuant to Fla. Stat. § 776.05(1), a "battery claims for excessive force [against a police officer] is analyzed by focusing on whether the amount of force used was reasonable under the circumstances.  Law enforcement officers are provided a complete defense as to an excessive use of force claim where an officer 'reasonably believes [the force] to be necessary to defend himself or another from bodily harm while making the arrest.'" *City of Miami v. Sanders*, 672 So.2d 46, 47 (Fla. 3d DCA 1996) (citations omitted) (quoting § 776.05(1)).

There is a dispute of material fact as to whether Officer Delaurentos stepped into the path of Mr. Ventura's vehicle or Mr. Ventura directed his vehicle at him after Officer Delaurentos was already in the road.  During his deposition, Officer Delaurentos was inconsistent about where he was when the vehicle completed the u-turn and made its way back towards him.  Initially, he stated that he did not recall whether he was already standing in the road or he stepped into the road after the vehicle turned back [D.E. 129-3, at 235-236].  Later, he indicated that he stepped into the road before the vehicle completed the u-turn [D.E. 129-4, at 316].  At another point, he indicated that he stepped into the road after the vehicle had completed the u-turn [D.E. 129-3, at 266].[4]

Also disputed is whether Officer Delaurentos shot Mr. Ventura before or after he was safely out of the way of the vehicle.  In the statement he made shortly after the shooting, Officer Delaurentos stated that he jumped out of the way and then shot at the vehicle [D.E. 36-2, at 99].  But at his deposition, he testified that he shot Mr. Ventura as he jumped out of the way of the vehicle or

---

[4]    There appears to be no evidence in the record conclusively establishing how far the vehicle was from Officer Delaurentos when it made the u-turn.

that he could not recall exactly when he shot at the vehicle [D.E. 129-3, at 262-264, D.E. 129-4, at 310].

Finally, there is other evidence which lends support to Ms. Peguero's contention that Officer Delaurentos was not in danger when he shot Mr. Ventura. Officer Delaurentos has consistently testified that he was four to six feet away from the vehicle when he fired the shot [D.E. 129-3, at 284]. In addition, Mr. Ventura's autopsy report indicates that the bullet entered Mr. Ventura's arm first and then penetrated his chest [D.E. 36-2, 60], indicating that the car may have already passed Officer Delaurentos (thereby eliminating or lessening any threat) when he shot Mr. Ventura.

In sum, because critical facts surrounding Mr. Ventura's shooting remain disputed, the ultimate issue of whether Officer Delaurentos' shooting of Mr. Ventura was justified cannot be resolved on summary judgment. *See Ansley v Heinrich*, 925 F.2d 1339, 1343 (11th Cir. 1991) (under Fla. Stat . § 776.05, "[w]hether the officers' use of force was reasonably necessary is an issue of fact for the jury to determine"). If requested, I will likely give a jury instruction concerning § 776.05.

### F. SOVEREIGN IMMUNITY FOR THE PURSUIT AND INVESTIGATION

The complaint alleges that Officer Delaurentos was negligent in the investigation and pursuit of Mr. Ventura, and that such negligence caused Mr. Ventura's death. The County moves for summary judgment, arguing that the Officer's investigation is shielded by sovereign immunity because an investigation is a discretionary act.

Florida has waived sovereign immunity for liability in tort actions "or any act for which a private person under similar circumstances would be held liable." *Henderson v. Bowden*, 737 So.2d 532, 534-535 (Fla. 1999)(citations omitted); *See also* Fla. Stat. § 768.28 . Thus, "there can be no governmental liability unless a common law or statutory duty of care existed that would have been applicable to an individual under similar circumstances." *Bowden*, 737 So.2d at 535. Florida law requires that courts perform a two-part analysis to determine whether sovereign immunity applies. First, the court must determine whether the state actor has a duty to the individual bringing the claim. Second, it must determine whether sovereign immunity bars the claim, regardless of any duty owed. The secondary determination is an analysis of whether the government acts at issue are "discretionary" or "operational." *See generally Pollock v. Florida Dep't of Highway Patrol*, 882 So.2d 928, 938 (Fla. 2004) (clarifying that the sovereign immunity analysis is a two-part analysis).

9

A state or county actor may not be held liable for actions involving general duties it may owe to the public at large. *See Pollock*, 882 So.2d at 935 (holding that the Florida Highway Patrol did not owe a special duty to an individual killed after a collision with an unlit truck parked on a highway, even though Florida Highway Patrol had received numerous calls advising them of the danger); *Department of Children and Family Serv. v. Chapman*, 9 So.3d 676, 686 (Fla. 2d DCA 2009) (holding that the Department of Children and Family Services owed no common law duties to families for damages caused by misconduct of counselor it had licensed, only a general duty owed to the public).   The County asserts that Officer Delaurentos owed no special duty to Mr. Ventura on the night of the shooting, arguing instead that Mr. Ventura was owed only the same duty as any police officer would owe to the general public.  But it is also well-established that once an officer decides on a specific action he owes a duty of care to those who are in the vicinity or in the "zone of risk." *See Pollock,* 882 So.2d at 935 ("A special tort duty does arise when a law enforcement officer becomes directly involved in circumstances which place people within a 'zone of risk' by creating or permitting dangers to exist, by taking persons into police custody, detaining them, or otherwise subjecting them to danger."). *See also Lewis v. City of St. Petersburg*, 260 F.3d 1260, 1263 (11th Cir. 2001) (under Florida law, police officers owed the plaintiff "and others within the zone of risk a specific duty to exercise reasonable care, when they drew and raised their weapons"). I do not believe the record in this case, viewed in the light most favorable to Ms. Peguero, merely implicates a general duty owed to the general public. Rather than attacking Officer Delaurentos' decision to investigate, a duty owed only to the general public and protected by sovereign immunity, Ms. Peguero is challenging the way Officer Delaurentos chose to investigate the case (allegedly stepping into a lane of traffic, thereby creating a risk of bodily harm, and discharging his gun) given that Mr. Ventura and his passenger were in the "zone of risk."  As established by the Eleventh Circuit in *Lewis* and the Florida Supreme Court in *Pollock*, state and county officials owe a duty to the individuals they encounter in these types of situations.  As such, I conclude that the County is not shielded by sovereign immunity as a matter of law.[5]

---

[5]    The jury, of course, may be instructed on sovereign immunity and asked to answer a special interrogatory verdict.

The County, relying on the Florida Supreme Court's opinion in *Trianon Park Condo. Assoc., Inc. v. City of Hialeah*, 468 So.2d 912 (Fla. 1985), also argues that even if Mr. Ventura was owed a duty individually, it has no liability here because Officer Delaurentos' acts were "discretionary." In *Trianon,* the Florida Supreme Court provided four categories to assist courts in determining whether a governmental entity may be held liable in tort under Florida's waiver of sovereign immunity. These categories are (1) legislative, permitting, licensing, and executive officer functions; (2) enforcement of laws and protection of public safety; (3) capital improvements and property control operations; and (4) provision of professional, educational, and general services for the health and welfare of the citizens. *Id.* at 919. The Florida Supreme Court explained that state actors are generally immune from liability for acts falling under categories (1)-(3), which are discretionary acts, and not subject to review by the courts. *Id.* at 919-921. Florida courts require this determination of whether the act in question is discretionary or operational because of the doctrine of separation of powers under article II, section 3 of the Florida Constitution, which necessarily bars courts from second guessing, and therefore encroaching upon, "the discretionary functions of the legislative or executive branches of government absent a violation of constitutional or statutory rights." *Id.* at 918 (citations omitted).

The County asserts that the allegations in the complaint fit into category (2) (enforcement of laws and protection of public safety) and are therefore discretionary acts for which it continues to enjoy sovereign immunity. But, as the Florida Supreme Court explained in *Trianon*, and as set forth in numerous decisions before and after that case, a police officer or other state actor, in the course of performing discretionary acts to enforce compliance with the law, continues to owe a duty of care in operational activities. *See id.* at 920; *City of Pinellas Park v. Brown*, 604 So.2d 1222, 1226-1227 (Fla. 1992). If the alleged negligent acts are "operational" then the County may be held liable for those actions even though Officer Delaurentos was also generally involved in a discretionary function.

In *Brown,* 604 So.2d at 1226-1227, the Florida Supreme Court held that the method chosen by police officers engaging in hot pursuit is an operational function not immune from liability if accomplished in a manner contrary to reason and public safety. In *City of Miami v. De La Cruz*, 784 So.2d 475, 478 (Fla. 3d DCA 2001), the Third District ruled that a police officer's chasing a suspect

through a crowd of people, on foot, was operational in nature and therefore the city was not immune from suit by a woman with whom the officer collided. In this case, after Mr. Ventura drove off, Officer Delaurentos decided to gather more evidence about the identity of the driver. In my view, this was a discretionary decision. He carried out that discretionary decision by stepping into the lane of oncoming traffic, and, according to Ms. Peguero's version of the facts, his negligent operational decision to gather additional evidence in this manner created the situation in which it was necessary for him to use deadly force.

I agree with the County that it could not be liable for Officer Delaurentos' decision to investigate or gather further information. Further, contrary to Ms. Peguero's argument, the standard operating procedures of the Miami-Dade Police Department, which Officer Delaurentos allegedly violated, cannot create a duty to Mr. Ventura or any other member of the public. *See Pollock*, 882 So.2d at 936-937. Nevertheless, the evidence suggests possible negligence by Officer Delaurentos in the manner in which he undertook his investigation, apart from any negligence in the initial decision to investigate in and of itself. *See generally Sanders*, 672 So.2d at 48 ("we recognize that a separate negligence claim based upon a distinct act of negligence may be brought against police officers in conjunction with a claim for excessive force. Nevertheless, the negligence component must pertain to something other than the actual application of force during the course of an arrest.") (citations omitted). Because Florida courts have held that the manner in which police officers pursue subjects who are attempting to flee is an operational decision not protected by sovereign immunity, the County does not enjoy sovereign immunity on this count as a matter of law and summary judgment is not appropriate. *See Wallace v. Dean*, 3 So.3d 1035, 1054 (Fla. 2009) (holding that where a sheriff's actions were "clearly operational in nature" the "case in no way presented a non-justiciable political question").[6]

---

[6]     Although not alleged by Ms. Peguero here, had this case involved a § 1983 claim against Officer Delaurentos in his individual capacity, he would likely have been entitled to qualified immunity on that count. *See Terrell v. Smith*, 2012 WL 255327 (11th Cir. 2012) (granting summary judgment on a § 1983 claim on facts very similar to this case).

### G.  MUNICIPAL LIABILITY UNDER 42 U.S.C. § 1983

The County moves for summary judgment on Count IV of the complaint, which alleges a violation of Mr. Ventura's Fourth Amendment rights under 42 U.S.C. § 1983.  Ms. Peguero has two grounds for her § 1983 claim. The first is that the County hires police officer candidates who are ranked as  "marginal" without requiring them to have additional training, and this practice is a County policy that led to Mr. Ventura's death.  The second is that the County "ratified" Officer Delaurantos' shooting of Mr. Ventura when the Police Compliance Bureau exonerated him and found that there had been no violations of County policy.  I agree with the County that Ms. Peguero's § 1983 claim does not survive summary judgment.

In relevant part, § 1983 provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

The Supreme Court has held that while municipalities like Miami-Dade County may be held liable under § 1983, they cannot not be held responsible on the basis of *respondeat superior*.  *See Monell v. Department of Social Serv. of City of New York*,  436 U.S. 658, 691 (1978).  Instead, municipal liability may be established only if the unconstitutional act is an official municipal policy or is pursuant to a government custom or practice. *Id.* at 694.  *Monell* itself involved an official government policy that was found to be unconstitutional.  Yet, as the Supreme Court pointed out in *City of Canton, Ohio v. Harris*,  489 U.S. 378, 390 (1989), rarely will a government have a policy of failing to train its employees or committing a constitutional violation. Therefore, most claimants must pursue municipal § 1983 claims by showing an unconstitutional practice or custom.

### 1.  FAILURE TO TRAIN

Ms. Peguero alleges that the County's failure to provide additional training to police officers who were categorized as "marginal" in preemployment screening resulted in the violation of Mr. Ventura's constitutional rights.  "There are only limited circumstances where an allegation of a failure to train or supervise can be the basis for liability under § 1983." *Gold v. City of Miami*, 151

13

F.3d 1346, 1350 (11th Cir. 1998).  Only when a "failure to train amounts to deliberate indifference to the rights of the persons with whom the police come into contact" may such failure serve as the basis for liability under § 1983. *See City of Canton*, 489 U.S. at 388.  Policymakers may reasonably be said to be deliberately indifferent where the need for training is obvious and the inadequacy is highly likely to result in a constitutional violations. *Id* at 389.  In cases where a training program is not inadequate on its face, "the need for more or better training may be obvious where a pattern of constitutional violations exists such that the municipality knows or should have known that corrective measures were needed." *Young v. City of Augusta*, 59 F.3d 1160, 1172 (11th Cir. 1995).  A municipality's "continued adherence to a program that has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action." *Board of County Com'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 407 (1997).  The Supreme Court's jurisprudence thus demands that Ms. Peguero demonstrate a pattern of unconstitutional activity by "marginal" hires, because proof of a single incident of unconstitutional conduct by a low-level employee will not suffice to impose municipal liability under *Monell*. *See City of Oklahoma v. Tuttle*, 471 U.S. 808, 824 (1985)(plurality opinion).

Because there is no evidence in the record of a pattern of unconstitutional violations by "marginal" hires sufficient to put the County on notice of the need to provide additional training to those officers, the County cannot be liable under *Monell*.  Ms. Peguero attempts to demonstrate deliberate indifference to the need for additional training by pointing to complaints filed against 30 police officers who were categorized as "marginal" in their pre-employment screening [D.E. 190-15]. A review of the documents filed to support this assertion, however, reveals that prior to Mr. Ventura's death, there had only been nine complaints involving six officers. All the other complaints were filed after Mr. Ventura's death, and therefore could not have put the County on notice. Of the nine complaints filed before Mr. Ventura's death, only three complaints involved an incident that might be considered a use of force (a battery, the shooting of an animal, and a use of force violation) and none of these complaints were sustained.  The only complaints sustained were allegations of "improper procedure."

It is not enough for Ms. Peguero to show that there were complaints.  *See Mettler v. Whitledge*, 165 F.3d 1197, 1205 (8th Cir. 1999) ("the mere existence of previous citizens complaints

does not suffice to show a municipal custom of permitting or encouraging excessive force"). Rather, she must show that there were a sufficient number of valid complaints to put the County on notice that additional training was necessary. The sustained cases in the record before Mr. Ventura's shooting are unrelated to the use of force and therefore could not have put the County on notice of the need for additional training for "marginal" hires that may have prevented the type of alleged violation that led to Mr. Ventura's death.[7]   As such, Ms. Peguero has not sufficiently shown a pattern establishing deliberate indifference. *See Gold*, 151 F.3d at 1351 (setting aside a jury verdict and award of attorney's fees and costs under §1983 where plaintiff proffered evidence only of the number of arrests made for disorderly conduct, and that roughly 15 percent of those arrests were not prosecuted, but no evidence of prior constitutional violations or false arrests that would have put the City on notice of the alleged constitutional violation); *Brooks v. Scheib*, 813 F.2d 1191, 1193 (11th Cir. 1987)(where there were numerous complaints against a police officer, but none were sustained, the plaintiff had not presented sufficient evidence of deliberate indifference to show a policy); *Ott v. City of Mobile*, 169 F. Supp.2d 1301, 1311 (S.D. Ala. 2001)(concluding that where there were only six sustained cases out of 162 complaints of excessive force in a five-year period, the plaintiffs had not presented enough evidence to establish the existence of a custom or policy of deliberate indifference or inadequate training program).

### 2. RATIFICATION

Ms. Peguero also argues that the County's policymakers ratified Officer Delaurentos' unconstitutional act and the reasons for it when, after a review of the incident by the Professional Compliance Bureau, Officer Delaurentos was exonerated and the exoneration was approved by the Director of the Police Department.  In *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986), the Supreme Court held that municipalities may be liable for a single unconstitutional act of a subordinate employee where the final policymaker "ratifies" the unconstitutional act and the unconstitutional basis for the action. *See also Matthews v. Columbia Cnty.,* 294 F.3d 1294, 1297

---

[7]       Ms. Peguero highlights the case of Officer #61, against whom an allegation of accidental shooting was filed and sustained.  Because Officer #61 was hired after the date of Mr. Ventura's death, and the complaint against him was filed in 2008, however, Officer #61's situation cannot be used to support Ms. Peguero's municipal liability claim.

(11th Cir. 2002).   As an initial matter, it is not clear whether the Director of the Police Department is the final policymaker for the County. *See Rosario v. Miami-Dade Cnty.*, 490 F.Supp.2d 1213, 1222 (S.D. Fla. 2007); *Hershell Gill Consulting Engineers, Inc. v. Miami-Dade Cnty.*, 333 F.Supp.2d 1305, 1333-334 (S.D. Fla. 2004).  I need not address that issue, however, because the County did not ratify Officer Delaurentos' alleged unconstitutional acts before they came final.

The County "may be held liable for a constitutional tort when policymakers have had the opportunity to review subordinates' decisions *before they become final*." *Thomas ex rel. Thomas v. Roberts,* 261 F.3d 1160, 1174 (11th Cir. 2001) (emphasis added).  Here, in the seconds between Officer Delaurentos' decision to shoot Mr. Ventura and the time of the shooting, there was clearly no opportunity for the County policymakers to review and ratify Officer Delaurentos' decision before it became final. As such, Ms. Peguero's claim under the ratification theory fails.  *See K.M. v. Sch. Bd. of Lee Cnty. Florida*, 150 Fed. Appx. 953, 957–960 (11th Cir. 2005) (school board could not be liable under the ratification theory because the board did not ratify a decision by the superintendent to deny plaintiff a due process hearing before the decision was final); *Sherrod v. Palm Beach Cnty. Sch. Dist.*, 424 F. Supp. 2d 1341, 1346 (S.D. Fla. 2006) (finding the record evidence could not support a judgment against a school district on the theory of ratification).[8]

---

[8]     Ms. Peguero cites to two cases, *Mandel v. Doe*, 888 F.2d 783, 791 (11th Cir. 1989), and *Garvie v. City of Ft. Walton Beach, Fla*, 366 F.3d 1186, 1189 (11th Cir. 2004), which she claims specifically supports her position that a municipality may be liable for the single act of a subordinate employee where that decision was ratified by the final policymaker.  Both cases are distinguishable, however, because neither case explicitly ruled on the ratification issue.  In *Mandel*, the Eleventh Circuit discussed the ratification theory of municipal liability, but explicitly declined to rule on that issue and disposed of the case on other grounds. *See Mandel,* 888 F.2d at 784 n.17.  Similarly, in *Garvie*, the Eleventh Circuit discussed the ratification theory, noting that it was doubtful that the plaintiff had even made out a § 1983 claim, but declined to rule on the issue, deciding the case instead based on the plaintiff's failure to state a constitutional violation. *See Garvie*, 366 F.3d at 1189.  *Garvie* also restated the principle that a municipality may be liable for a constitutional tort of a subordinate only when policymakers have had "the opportunity to review the subordinate's decision and agreed with both the decision and the decision's basis . . . ." *Id.* (citing *Thomas*, 261 F.3d at 1174)(quotations omitted).  Ms. Peguero does not cite any case where the municipal policymaker reviewed the decision of the subordinate employee *after* the subordinate employee's decision was completed and the court found the municipality liable under § 1983 pursuant to the ratification theory.

Because there is insufficient evidence to create an issue of fact as to whether the County was deliberately indifferent to the need to train "marginal" police officers, and because no County policymaker had an opportunity to review and ratify Officer Delaurentos' decision to shoot Mr. Ventura before the decision became final, the County is entitled to summary judgment on Ms. Peguero's § 1983 claim.

### IV. CONCLUSION

In sum, the defendants are entitled to partial summary judgment on the issue of damages as to Mr. Ventura's brothers because there is no evidence that they received any support or services from Mr. Ventura. The County is entitled to summary judgment on Ms. Peguero's municipal liability claim under 42 U.S.C. § 1983.  In all other respects, the summary judgment motions are denied.

**This case is set for trial during the Court's two-week trial calendar beginning April 9, 2012.  Calendar call will be held at 9 a.m. on April 3, 2012.**

DONE and ORDERED in chambers in Miami, Florida, this 14th day of February, 2012.

Adalberto Jordan
United States District Judge

Copy to:        All Counsel of Record